Kent A. Kawakami, CA Bar #149803
kent.kawakami@usdoj.gov
United States Attorney's Office
300 N. Los Angeles Street, Room 7516
Los Angeles, California 90012
Telephone: (213) 894-4858
Facsimile:  (213) 894-2380
Local Counsel

James H. Holl, III, CA Bar #177885
jholl@cftc.gov
Michael Solinsky, DC Bar #433754
msolinsky@cftc.gov
Alan Edelman, DC Bar #375495
aedelman@cftc.gov
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5000
Facsimile:  (202) 418-5523
Attorneys for Plaintiff U.S. Commodity Futures Trading Commission

### UNITED STATES DISTRICT COURT
### CENTRAL DISTRICT OF CALIFORNIA
### WESTERN DIVISION

| | |
|---|---|
| **U.S. COMMODITY FUTURES TRADING COMMISSION** <br> **Plaintiff,** <br><br> v. <br><br> **UNITED BUSINESS SERVICING LLC, d/b/a SCHOOLOFTRADE.COM, UNITED BUSINESS SERVICING, INC., d/b/a  SCHOOLOFTRADE.COM, JOSEPH DUFRESNE, a/k/a JOSEPH JAMES, and MEGAN RENKOW, a/k/a MEGAN JAMES,** <br> **Defendants.** <br> _____ | ) <br> ) Case No. _____ <br> ) <br> ) <br> ) <br> ) <br> ) **COMPLAINT FOR INJUNCTIVE** <br> ) **RELIEF, CIVIL MONETARY** <br> ) **PENALTY, AND OTHER** <br> ) **EQUITABLE RELIEF UNDER** <br> ) **THE COMMODITY EXCHANGE** <br> ) **ACT** <br> ) <br> ) <br> ) <br> ) |

Plaintiff, U.S. Commodity Futures Trading Commission ("CFTC"), by and through its attorneys, alleges as follows:

## I.    SUMMARY

1.      Since at least October 2011, and continuing through the present (the "Relevant Period"), Defendants United Business Servicing, LLC ("UBS LLC"), doing business as SchoolofTrade.com ("SoT") and United Business Servicing, Inc. ("UBS Inc."), as successor in interest to UBS LLC, and doing business as SoT, by and through the actions of their employees and agents, including but not limited to Defendant Joseph Dufresne ("Dufresne"), also known as Joseph James, and Defendant Megan Renkow, also known as Megan James (collectively, "Defendants"), have engaged and continue to engage in the fraudulent promotion of trading strategies and systems to be used for the trading of commodity futures contracts on or subject to the rules of designated contract markets.

2.      To carry out their fraud, Defendants have engaged, and continue to engage, in a systematic pattern of material false statements and omissions in connection with the marketing of SoT's trading strategies and systems.  Each and every material misrepresentation and omission made by Defendants was made with knowledge, or with reckless disregard for the fact, that it was false and misleading.

3.      SoT sells various levels of "memberships" that allow clients varying degrees of access to SoT's trading strategies and to SoT's "Live Trade Room."

These memberships range in price from $249.99 per month for a Beginning Membership to a one-time payment of $4,999 for a lifetime Advanced Membership.  During the Relevant Period, SoT has sold approximately 877 memberships and has taken in approximately $2,776,994.  On information and belief, SoT continues to take in additional revenue from ongoing sales of memberships.

4.     To sell memberships, Defendants have made, and continue to make, material false and misleading statements, and have omitted, and continue to omit, material information concerning: a) the professional experience and trading success of Dufresne; b) the profitability and performance record of SoT's trading strategies and systems; and c) the actual nature of the trading activity purporting to take place during SoT's "Live Trade Room."

5.     In addition, Defendants have failed to display prominently in their solicitation material certain required disclosure statements concerning simulated or hypothetical trading results, and client testimonials.

6.     By virtue of this conduct, and the conduct further described herein, Defendants have violated, and continue to violate Section 4o of the Commodity Exchange Act (the "Act"), 7 U.S.C. § 6o(1) (2012), and CFTC Regulations ("Regulations") 4.41(a) and (b), 17 C.F.R. §§ 4.41(a) and (b) (2016).

7.      During the Relevant Period, Dufresne and Renkow are officers, employees, or agents of UBS LLC and UBS Inc.  Therefore, pursuant to 7 U.S.C. § 2(a)(1)(B) (2012) and 17 C.F.R. § 1.2 (2016), UBS, LLC and UBS Inc. are liable for the acts and omissions of Dufresne and Renkow that violated the Act and Regulations.

8.      During the Relevant Period, Dufresne and Renkow are controlling persons of UBS LLC and UBS Inc. who have not acted, and are not acting in good faith, or who have knowingly induced, and are knowingly inducing, directly or indirectly, the acts and omissions constituting UBS LLC's and UBS Inc.'s violations of the Act and Regulations.  Therefore, pursuant to 7 U.S.C. § 13c(b) (2012), Dufresne and Renkow are liable for UBS LLC's and UBS Inc.'s violations of the Act and Regulations.

9.      Unless restrained and enjoined by this Court, Defendants will likely continue to engage in the acts and practices alleged in this Complaint, or in similar acts and practices, as described more fully below.

10.      Accordingly, pursuant to 7 U.S.C. § 13a-1 (2012), the CFTC brings this action to enjoin Defendants' unlawful acts and practices, to compel their compliance with the Act and Regulations, and to enjoin them from engaging in any commodity-related activity.  In addition, the CFTC seeks civil monetary penalties, restitution, and remedial ancillary relief, including, but not limited to, trading and

registration bans, disgorgement, pre- and post-judgment interest, and such other and further relief as the Court may deem necessary and appropriate.

## II.     JURISDICTION AND VENUE

11.     The Court has jurisdiction of this action pursuant to 7 U.S.C. § 13a-1, which provides that, whenever it shall appear to the CFTC that any person has engaged in, is engaging in, or is about to engage in any act or practice that constitutes a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the CFTC may bring an action against such person to enjoin such practice or to enforce compliance with the Act or Regulations.

12.     Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e), because Defendants are found in, inhabit, or transact business in this District, or the acts and practices in violation of the Act and Regulations occurred, are occurring, or are about to occur within this District, among other places.

## III.     THE PARTIES

13.     Plaintiff **U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility for administering and enforcing the provisions of the Act and the Regulations promulgated thereunder.

14.     Defendant **United Business Servicing LLC**, doing business as SchoolofTrade.com, was a Delaware entity formed in February 2008.  At various

times, UBS LLC listed its address as Los Angeles, California and San Pedro, California.  From in or about late 2008 until in or about early 2012, UBS LLC described itself on the SoT website as the parent company of SoT.  UBS LLC filed a Certification of Cancellation with Delaware in October 2012.  UBS LLC has never been registered with the CFTC in any capacity.

15.     Defendant **United Business Servicing Inc.**, doing business as SchoolofTrade.com, is a Delaware corporation, incorporated in July 2011.  In November 2011, UBS Inc. registered as a foreign corporation in California.  UBS Inc.'s California incorporation record lists its address as Redondo Beach, California.  UBS Inc. is the successor in interest to UBS LLC.  Since in or about early 2012, UBS Inc. has described itself on the SoT website as the parent company of SoT.  UBS Inc. has never been registered with the CFTC in any capacity.

16.     Defendant **Joseph Dufresne,** who uses the name Joseph James in connection with his activities related to SoT, currently resides in Palos Verdes Estates, California.  Dufresne is the husband of Defendant Renkow.  At various times during the Relevant Period, Dufresne has held himself out as the Owner, Founder, CEO, and Head Trader of SoT.  Dufresne has never been registered with the CFTC in any capacity.

17.    Defendant **Megan Renkow,** who uses the name Megan James in connection with her activities related to SoT, resides in Palos Verdes Estates, California.  Renkow is the wife of Defendant Dufresne.  Renkow has never been registered with the CFTC in any capacity.

## IV.    STATUTORY BACKGROUND

18.    7 U.S.C. § 1a(6) (2012) defines a Commodity Trading Adviser ("CTA") as any person who, for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market.

19.    7 U.S.C. § 6o(1) makes it unlawful for a CTA, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly (A) to employ any device, scheme, or artifice to defraud any client or customer or prospective client or customer; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

20.    17 C.F. R. § 4.41(a)(1)-(2) makes it unlawful for a CTA, or any principal thereof,  to advertise in a manner which (1) employs any device, scheme or artifice to defraud client or prospective client; or (2) involves any transaction,

practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

21.    17 C.F.R. § 4.41(a)(3)(i)-(ii) makes it unlawful for a CTA, or any principal thereof, to advertise in a manner which refers to any testimonial, unless the advertisement or sales literature providing the testimonial prominently discloses, among other things, that: (1) the testimonial may not be representative of the experience of other clients; and (2) the testimonial is no guarantee of future performance or success.

22.    17 C.F.R. § 4.41(b) provides that no person may present the performance of any simulated or hypothetical commodity interest account, transaction in a commodity interest or series of transactions in a commodity interest of a CTA, or any principal thereof, unless such performance is accompanied by the following prescribed statement:

> These results are based on simulated or hypothetical performance results that have certain inherent limitations.  Unlike the results shown in an actual performance record, these results do not represent actual trading.  Also, because these trades have not actually been executed, these results may have under-or-over-compensated for the impact, if any, of certain market factors, such as liquidity.  Simulated or hypothetical trading programs in general are also subject to the fact

that they are designed with the benefit of hindsight.  No representation

is being made that any account will or is likely to achieve profits or

losses similar to these being shown.

The Regulation further provides that if the presentation is other than oral, the

prescribed statement must be prominently disclosed and in immediate proximity to

the simulated or hypothetical performance being presented.

## V.   FACTS

**A.   Defendants' Operation of SoT**

23.   Renkow formed UBS LLC in Delaware in February 2008.  She is

listed as the sole Member on UBS LLC's formation papers, although in a

document executed in September 2008, and again in a similar document in June

2009, Renkow confirmed that Dufresne was an officer of the company and had full

access to company accounts and full authority over the operations of the company.

24.   The SoT website (www.schooloftrade.com) first appeared in or about

late 2008.  The website at that time listed UBS LLC as the parent company of SoT.

25.   UBS Inc. was incorporated in Delaware in July 2011.  In November

2011, Renkow registered UBS Inc. as a foreign corporation in California.

According to UBS Inc.'s California corporation records, Renkow is the President,

Chief Executive Officer, Secretary, and Chief Financial Officer of UBS Inc.  In a

document dated January 2012, Renkow stated that she is the "sole 100% owner of all shares and interest in United Business Servicing Inc."

26.     As late as January 2012, UBS LLC continued to be listed as the parent company on the SoT website; however, sometime between January 2012 and March 2012, the SoT website was changed to reflect UBS Inc. as the parent company of SoT.  In or about September 2012, Renkow filed a Certificate of Cancellation for UBS LLC with the state of Delaware.  The cancellation was granted in or about October 2012.

**B.     Products and Services Offered by Defendants**

27.     During the Relevant Period, Defendants have operated the SoT website through which they have solicited members of the public to purchase memberships in SoT that allow them varying degrees of access to trading strategies and systems to be used for trading commodity futures contracts.  Defendants demonstrate how to use these trading strategies and systems through seminars, training videos, one-on-one training sessions, and access to a "Live Trading Room."

28.     SoT offers three levels of membership: a) a Beginner Membership for the price of $249.99 per month; b) an Intermediate Membership for a one-time price of $2,499.00 plus $99 per month after six months; and c) a lifetime Advanced Membership for a one-time price of $4,999.00.  The Intermediate and Advanced

levels of membership offer clients access to an increasing number of trading strategies beyond the Beginner level.

29.     Purchasers of the Beginner Membership have access to SoT's trading newsletter (available through a link on the SoT website), as well as a limited number of tutorials and strategies focused on the basics of trading.

30.     Purchasers of the Intermediate Membership have all of the benefits of the Beginner Membership, as well as access to a broader array of tutorials and strategies.

31.     Purchasers of both the Intermediate and Advanced memberships have access to a customizable automated trading system.  According to its website, SoT offers "3 different fully-automated and semi-automated trading systems for our clients to make money on any market, any time of the day" that "[use] cutting-edge algorithmic trading technology […] that will allow our computer to do the trading for us [sic]."  At various times during the Relevant Period, both Intermediate and Advanced memberships also included a Professional Trading Plan, which, according to the "Frequently Asked Questions" section of the SoT website, is a "personalized trade plan focusing on the best trading opportunities according to your trading times."

32.     Purchasers of the Advanced Membership also have access to what SoT describes as "Concierge Services."  These services include, among other

things, one-on-one training sessions and technical support, for which a client pays an hourly fee.

33.     The most highly touted benefit of Advanced Membership is access to SoT's "Live Trade Room."  According to the SoT website, this is "the most important part of the Advanced Membership." The "Live Trade Room" is a video feed that Advanced Members can access through their computers or other streaming devices.  The SoT website describes the "Live Trade Room" as a place where customers can follow Dufresne as he engages in "'live trades' called with exact entry and exit information using [SoT's] proprietary indicators, templates, and strategies."

34.     During the Relevant Period, SoT has sold approximately 877 memberships and has taken in at least $2,776,994.  From January through April 2016, SoT averaged nineteen (19) new clients per month and approximately $60,000 per month in revenue from sales of memberships.

**C.     Defendants Solicited Clients to Purchase SoT's Products and Services Through False and Misleading Statements and Omissions**

35.     Defendants market SoT's products and services through, among other methods, the SoT website, seminars open to the public, marketing emails, and various social media sites such as Twitter, Facebook, and YouTube.  These products and services are marketed to clients as tools that will enable them to make money trading commodity futures contracts and Defendants tout the likelihood of

12

profits that can be gained by using them.  Among the statements Defendants have made on the SoT website, in emails to clients, and in social media are the following:

a.   In a May 9, 2012 posting to the webpage www.schooloftrade-review-diet.com, Dufresne states, "There is NOTHING more powerful than learning by DOING with me every day, and **you will make an average of 30 ticks per day in the first 10 days of my 'plan' so you will make money while you learn** the ropes" (emphasis added);

b.   In a November 6, 2013 email to a potential client who was skittish after a bad experience with another company, Renkow states, "I can assure you that if your A[uto]T[rader] is set-up correctly **you should make very similar results** to our posted results. You will be fine with $7k and **will make money as planned**" (emphasis added);

c.   In a February 2014 email response to a potential client who inquired about his ability to make back the cost of his SoT membership through trading with Dufresne, Renkow states, "If you trade with JJ 16 trading days per month **it will take you a**

13

**little over one month to recoup your total investment**"

(emphasis added); and

    d.      In a December 21, 2014 posting to his Facebook page,

Dufresne states, "… Im (sic) talking about the simple process of

mastering a simple strategy that **allows you to make $100**

**today, $200 tomorrow, and $400 next week**… No get rich

quick… its (sic) about investing the TIME and getting PAID a

reward." (emphasis added).

36.    In the course of soliciting clients to purchase SoT's products and

services, Defendants have made numerous false and misleading statements and

have omitted material information concerning: a) the professional experience and

trading success of Dufresne; b) the profitability and performance record of SoT's

trading strategies and systems; and c) the actual nature of the trading activity

purporting to take place during SoT's "Live Trade Room."

        **1.**    **Dufresne's Experience and Success as a Trader**

37.    One of the major selling points employed by Defendants in marketing

SoT is the purported experience and success of Dufresne as a trader.  A webpage

on SoT's website titled "Meet the Team" lists Dufresne at the top and refers to him

as a "Professional Trader… [who] specializes in intra-day trading of crude oil,

Euro, Gold and E-Mini Russell Futures Markets along with the Major Forex

Pairs."  The SoT Blog (which is accessed from a link on the main webpage of the SoT website) provides a link to Dufresne's page on the LinkedIn.com website.  As late as August 2015, that page, which purports to provide a resume of Dufresne's professional background, stated, among other things that:

      a.    Dufresne "has been trading Futures and FOREX since the year 2000";

      b.    "After 3 years of very successful trading, [Dufresne] opened his first Hedge Fund in 2003";

      c.    Dufresne has been a "Professional Day Trader" at Vantage Capital Advisers LLC in Los Angeles since 2000;

      d.    Dufresne received an award as "Trader of the Year" in 2001; and

      e.    Dufresne was named to the "Top 30 under 30" by Professional Trader Monthly in 2006.

38.    Defendants have also touted Dufresne's experience in solicitation emails to prospective clients, including the following:

      a.    In an October 20, 2014 solicitation email, Dufresne states, "What if you had **a 14-year, professional trader** helping you every step of the way?" (emphasis added);

b.      In an October 24, 2014 solicitation email, Dufresne states, "Trend-Following has been our '*bread-and-butter*' **for over 10 years**" (emphasis added); and

c.      In a May 26, 2015 solicitation email, Dufresne states, "I have worked with thousands of traders **in my 14-year career**" (emphasis added).

39.     All of these statements regarding Dufresne's background and experience as a trader are false and misleading.  Dufresne has not been a professional trader since 2000, nor has he been recognized for his trading acumen as described above.  In fact, prior to 2007, not only was Dufresne not a professional trader, he had no trading experience whatsoever.  In September 2007, Dufresne opened two trading accounts – one specifically for futures trading and one specifically for foreign exchange trading – in his own name with a registered Futures Commission Merchant ("FCM").  In the account application documents for each account, Dufresne was required to list his trading experience.  Each application asked for the number of years' experience he had trading stocks, options, futures, and forex.  Dufresne responded "none" for each category on each application.  The applications also asked for the number of trades executed in each of these categories in an average month.  Again, Dufresne responded "none" for each category on each application.

40.     In October 2008, Dufresne submitted an application to the National Futures Association ("NFA"), the futures industry's self-regulatory organization, for registration as a Principal of an entity called Vantage Capital Management LLC ("Vantage").  At the time, Vantage had a pending application with the NFA to be registered as a CTA.  In his application – which Dufresne was required to verify as "true, complete, and accurate and… not misleading in any material respect…." – Dufresne was required to list his employment history.  For the period June 1999 to November 2007, Dufresne listed his employment as including jobs as a maintenance worker at a country club, a front desk operator at a fitness center, a student worker at Arizona State University, and a loan officer, sales manager, or owner at various mortgage companies.  Dufresne's application also stated that for the period November 2007 to October 2008, he was unemployed.  Nowhere in his application did Dufresne state that he had been a professional day trader at Vantage Capital Advisers LLC since 2000, or that he had been in charge of a hedge fund since 2003.  In February 2009, both Dufresne and Vantage withdrew their applications with the NFA.

41.     Dufresne's claims to have been a professional trader and hedge fund operator are also belied by the fact that he was incarcerated for six months in 2005. According to the records of the Superior Court of Arizona, Maricopa County,

Dufresne was sentenced on May 12, 2005 to serve six months in the county jail following a plea agreement to a felony charge of attempted sale of narcotics.

42.     Defendants not only tout Dufresne's experience as a trader, they also tout his trading success, purposefully creating the impression among prospective clients that Dufresne is able to live an extravagant lifestyle as a result of the trading success he has achieved using the strategies he is offering to clients.  Among the statements made to this effect are the following:

a.     In a May 12, 2012 posting on the webpage www.schooloftrade-review.com, Dufresne states, "Traders Lifestyle: we love to trade, and **we live a great lifestyle from our profits**" (emphasis added);

b.     In a November 17, 2014 posting on his Facebook page (a link to which is included on the SoT website), Dufresne states, "LOL… old school traders always tell me these charts dont (sic) work… **until they see my bank account!**" (emphasis added);

c.     In a December 9, 2014 posting on his Facebook page, Dufresne states, "PLEASE tell me someone bought those lose [sic] on Russell this morning!  **I better not be the only person cashing**

**this monster check** this afternoon! #SchoolOfTrade #DayTrading #Newsletter" (emphasis added); and

d. In a July 20, 2015 posting to his Twitter page (a link to which is included on the SoT website), Dufresne states, "Thank you #CrudeOil **for paying my bills for me today!** Love those #Traps!" (emphasis added)

43. All of these statements are false and misleading. Dufresne has never been a profitable trader. Dufresne has held himself out as SoT's Head Trader; however, SoT has never had a trading account in its name. Between September 2007 and April 2016, UBS LLC and UBS Inc. (the parent company and successor in interest parent company of SoT) opened a combined twelve (12) trading accounts in their names. Of these twelve accounts, only four (4) appear to have had any trading activity. None of those four accounts was profitable on an individual basis and the accounts incurred combined gross losses of $6,985 and combined net losses of $9,765.14. During the same time period, Dufresne opened two trading accounts in his own name and two other trading accounts in the name of Lending Hands LLC ("Lending Hands"), a business of which he was indirectly the owner. Dufresne never funded the two accounts in his own name. The two accounts in the name of Lending Hands incurred gross losses of $99,377.50 and net losses of $109,258.98. Moreover, the records of the trading accounts with

which Dufresne has been associated show that, contrary to his claims on December 9, 2014, and July 20, 2015 (as cited in Paragraph 42(c) and (d) above), there were no profitable trades and, indeed, no trades at all, on those days in any those accounts.

### 2. The Profitability and Performance Record of SoT's Trading Strategies and Systems

44. Defendants also tout the profitability and performance of their trading strategies and systems. For example:

    a. In a January 24, 2012 solicitation email, Dufresne states, "Click here to review the simple trading plan we used to **earn 100 ticks of profit this morning!**" (emphasis added);

    b. In a February 3, 2012 solicitation email, Dufresne states, "We **earned over 500 ticks per contract** in January…" (emphasis added);

    c. In a May 18, 2012 solicitation email, Dufresne states, "This morning we finished up a record breaking week, **earning over $10,000 in profits this week alone**… This is a true testament to the effectiveness of our trading method…." (emphasis added); and

    d. In a May 19, 2015 on-line chat with a disgruntled client who was questioning the actual success of Dufresne's trading,

Renkow states, "…last week we didn't have any losing trades at all for 4 of the days."

45.    At various times during the Relevant Period, Defendants directly provided clients and potential clients with the performance record of SoT's automated trading systems.  For example, on October 30, 2013, Renkow sent copies to a potential client of the 2012 and 2013 performance records for SoT's "auto-trader."  On March 18, 2014, Renkow sent another potential client a copy of the performance record for SoT's "FLEX Auto-Trader" for 2012 and 2013.  At various other times, Defendants posted the performance record of SoT's automated trading systems on the SoT website's "Blog," which is accessible to the general public through a link on the website's main webpage.   Those records claimed the following results for SoT's Auto-Trader program:

a.    In 2011, $169,935 in profits;

b.    In 2012, $114,675 in profits; and

c.    In 2013, $156,150 in profits.

46.    Defendants have stated on numerous occasions that their automated trading system results were obtained in a funded trading account.  On September 26, 2013, Defendants posted the following to the webpage www.schooloftrade-review-membership.com: "**Are these strategies back-tested? Are you trading with real money? YES.** Our automated trading systems are back-tested, forward-

tested, and currently running on LIVE trade accounts." (emphasis in original)  At least as late as June 24, 2014, the SoT website contained the following statements in its "Frequently Asked Questions" section: "**Are the Auto Trader results, Live Results?** - Yes, the auto trader results we post are indeed taken in a LIVE environment on a LIVE account. We use the same auto trader ourselves that we provide to our members." (emphasis in original)

47.     At various times during the Relevant Period, Defendants also posted in the Member's section of the SoT website, or otherwise distributed, other performance records for SoT.  Those records claimed the following results:

        a.     In 2011, $411,715 in profits;

        b.     In 2012, $433,861 in profits;

        c.     In 2013, $491,145 in profits;

        d.     In 2014, $626,864 in profits; and

        e.     In 2015, $716,104 in profits.

48.     The profit claims made in SoT's solicitations and in its performance records, as set forth in Paragraphs 44, 45, and 47 above, are false and misleading. As set forth in Paragraph 43 above, SoT has never had any trading accounts in its name and none of the accounts in the name of either UBS LLC or UBS Inc. has ever been profitable.  Moreover, UBS LLC and UBS Inc. account records fail to

support any of the specific claims of profits cited in Paragraphs 44, 45, and 47 above.

### 3.     Trading Activity in SoT's "Live Trade Room"

49.     Defendants operate the "Live Trade Room" to show clients how to apply SoT's strategies in the markets.  Defendants have described the "Live Trade Room" on the SoT website as "a web-based trading room where we watch charts, call trades, teach our strategies, and answer questions that are typed into the chat box."

50.     Defendants also promote the "Live Trade Room" as a place where clients can make money by shadow-trading the trades announced in the session. On May 9, 2012, Dufresne posted the following statement to the webpage www.schooloftrade-review-diet.com (which, at the time, was accessible through the SoT website): "In our trade room, I provide our members with the exact entry, stop loss, and profit targets SPECIFICALLY so that my new traders (following the trade plan) can shadow-trade with me during their learning process."  At least as late as June 2014, the SoT website contained the following language with regard to the "Live Trade Room": "Benefit from Shadow-trading opportunities while you learn to master your skills of professional trading.  Make money the very first day with easy-to-follow trade calls which provide EXACT information such as entry

price, stop-loss and profit-targets.  You'll be amazed how quickly you will learn by participating in our Live Trade Room with professionals."

51.    Many, if not most, sessions of the "Live Trade Room" are run by Dufresne, although there are some sessions in which other SoT employees appear.

52.    Communication between Dufresne and clients in the "Live Trade Room" consists of: a) a chat room component, through which clients may submit questions; b) an audio component, through which clients hear Dufresne answer questions and announce trades; and c) a video component, through which clients see trading charts and other visual aids.

53.    Defendants purport that the activity in the "Live Trade Room" is happening in real time.  For example:

> a.    In a promotional video titled "Join our Trade Room," that was posted to SoT's YouTube channel on July 26, 2014, Dufresne invites viewers to join him in the "Live Trade Room," where he will show trading "in real time."
>
> b.    In a video titled "Simple Day trading strategy earns profit on any futures market," that was posted to the SoT YouTube channel on May 21, 2013, Dufresne says, "I'm a teacher, but I'm also a trader.  In fact, from what I'm told I'm one of the

only people that moderates a trade room, right, trades live, and teaches in real time."

    c.      In an April 28, 2014 solicitation email, Dufresne states, "I teach our students every morning in our Live Trade Room how to find the best times and locations to find a price reversal and **then I call the trade in real time** with exact entry and exit so everyone can profit alongside me!" (emphasis in original)

54.     Defendants also create the impression that the trading being done in the "Live Trade Room" is being done with a real, funded account and that Defendants are making real money as a result of the trades announced in the "Live Trade Room." Indeed, this is a major component of Defendants' solicitations, both in emails to clients and in video recaps of the "Live Trade Room" which are posted to SoT's YouTube Channel and are, in essence, a means of advertising Defendants' products and services. For example:

    a.      In a video titled "4 Trades for 150 ticks; We Love This Trading Pattern," posted on December 9, 2011, Dufresne states, "we made 31 ticks buying fading the news, follow[ed] the plan. We made at 9:02 here another 45 ticks, right? That's, what, 76 ticks? So 76 ticks in the first trade, guys, **that's 760 USD before 9:05 this morning**." (emphasis added);

b.    In a video titled "Simple Day Trading Strategy Earns Profit on Any Futures Market," posted on May 21, 2013, Dufresne states, "Just had a question come in from a guest here this afternoon that said 'Why we don't trade the S&P more often?' […] I tell you, I have a hard time getting to the S&P, **tripping over all these bags of cash we keep making** on the Euro, the gold, the Russell and Crude Oil." (emphasis added);

c.    In a January 27, 2014 solicitation email, Dufresne states, "Monday's trading session was <u>FILLED with excitement</u>, and **we made some incredible income** in our Live Trade Room alongside the members of SOT" (emphasis added);

d.    At least as late as June 2014, SoT's website contained the following statement: "Follow along with professional traders as they use Daily Price Levels and our Trading Plan **to take real trades on real trade accounts.**" (emphasis added);

e.    In an October 20, 2014 solicitation email, Dufresne states, "**<u>Click here to watch us earn $1,950 LIVE from our Trade Room</u>**" (emphasis in original);

f.    In a November 16, 2014 email to a complaining client, Dufresne states, "**We earned over $500** both days you attended

our Live-Trade-Room.  Our students made money with me.
…Let me be clear… **I trade a live account**." (emphasis added);
and

    g.    In a video titled "WAVE Pattern Trading The E-Mini Russell Futures; SchoolofTrade.com," posted on April 20, 2015, a SoT employee claims to have made 238 ticks ($1,190) in E-Mini Russell Futures: "Let me get my stop in place here a little bit tighter… if we get that hit. We're looking at 238 ticks on the trade… that's still $1,100 on the trade… if we get them all filled… we'll pause the video.  We'll come back in a little bit and … we held out to pull out the full move. **So 238 ticks… $1,190 dollars on the trade**."  (emphasis added)

55.    All of these statements regarding executing trades in a "real" or "live" trading account and money made in the "Live Trade Room," as set forth above in Paragraphs 53 and 54 above, are false and misleading.  As set forth in Paragraph 43 above, SoT has never had any trading accounts in its name and none of the accounts in the name of either UBS LLC or UBS Inc. has ever been profitable.  Moreover, UBS LLC and UBS Inc. account records fail to support any of the specific claims of profits cited in Paragraph 54(a), (e), (f), and (g) above.

**D.    Defendants Failed To Prominently Display in Their Solicitation Material Certain Required Disclosure Statements Concerning Testimonials and Hypothetical or Simulated Trading Results and Client Testimonials**

56.    The SoT website includes a webpage on which Defendants display client testimonials.

57.    As late as October 2015, the SoT webpage on which client testimonials are displayed failed to include the language required under 17 C.F.R § 4.41(a)(3)(i)-(ii).  It was not until sometime in or about 2016 that Defendants began including the required language on the webpage.  Even after it was included, however, the language is not displayed prominently; rather, it can only be found by scrolling all the way down to the very bottom of the webpage.

58.    On their website, in their solicitation emails, and in their video recaps of the "Live Trade Room," Defendants have advertised performance results that were – at best – based on hypothetical or simulated trading.  While the SoT website does include language relating to hypothetical or simulated performance, such language can only be found by scrolling down to the very bottom of the website's main webpage and then clicking on a link entitled "Terms & Conditions" that is located in the footer of the webpage.  That link leads the reader to a new webpage.  The reader must then scroll about half-way down this webpage before he finds the language relating to hypothetical or simulated performance.  The language is not displayed prominently, nor is it displayed in immediate proximity

to the performance results advertised for the automated trading program or the other performance results.  Moreover, the language displayed does not include the following statements, which are required under 17 C.F.R. § 4.41(b): "These results are based on simulated or hypothetical performance results that have certain inherent limitations.  Unlike the results shown in an actual performance record, these results do not represent actual trading."

59.    None of the solicitation emails cited in Paragraph 44(a), (b), and (c) and Paragraph 54(c) and (e) above, which touted profits earned, contained any language relating to hypothetical or simulated performance.

60.    At least some of the video recaps of the "Live Trade Room" posted to SoT's YouTube channel, failed to contain any statement relating to hypothetical or simulated performance.  Indeed, it appears that it was not until sometime in or about late 2012, when Defendants began posting language on the webpage containing a new video (although not in the video itself) relating to hypothetical or simulated performance; however, this language can only be found by clicking on a link on the webpage entitled "Show More."  It appears that it was not until in or about April 2016, when Defendants began posting a banner with language relating to hypothetical or simulated performance at the beginning of each new video on SoT's YouTube webpage.  Again, however, neither the language posted on the webpage beginning in 2012, nor the language posted at the beginning of the new

videos beginning in 2016, includes the prescribed statement that these specific results are based on simulated or hypothetical performance results and that they do not represent actual trading.

**E.    Dufresne and Renkow Are Control Persons of UBS LLC and UBS Inc.**

61.    At all times during the Relevant Period Dufresne and Renkow were control persons of UBS LLC and UBS Inc.  Dufresne, along with Renkow, exercised control over the day-to-day operations of both UBS LLC and UBS Inc., which consisted primarily, if not solely, of the operation of SoT.  Indeed, Dufresne, at various times, has held himself out as the Owner, Founder, CEO, and Head Trader of SoT.  According to documents executed by Renkow, Dufresne was an officer of UBS LLC and had full access to company accounts and full authority over the operations of UBS LLC.  He is a signatory and/or authorized trader on at least some, if not all, of UBS LLC's and UBS Inc.'s bank accounts and trading accounts.  Renkow was the sole Member of UBS LLC, and is the President, Chief Executive Officer, Secretary, and Chief Financial Officer of UBS Inc.  Along with Dufresne, she exercised control over the day-to-day operations of UBS LLC and UBS Inc., which consisted primarily, if not solely, of the operation of SoT.  She is a signatory on at least some, if not all, of UBS LLC's and UBS Inc.'s bank accounts and trading accounts.

## VI.   VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND CFTC REGULATIONS

## COUNT I

## VIOLATION OF 7 U.S.C. § 6o(1) AND 17 C.F.R. § 4.41(a)(1)-(2): FRAUD BY A COMMODITY TRADING ADVISOR

62.    Paragraphs 1–61 are realleged and incorporated herein by reference.

63.    7 U.S.C. § 6o(1) makes it unlawful for a CTA, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly (A) to employ any device, scheme, or artifice to defraud any client or customer or prospective client or customer; or (B) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

64.    17 C.F. R. § 4.41(a)(1)-(2) makes it unlawful for a CTA, or any principal thereof,  to advertise in a manner which (1) employs any device, scheme or artifice to defraud client or prospective client; or (2) involves any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client.

65.    Through the sale of SoT's products and services, which include, among others: a) an automated trading system that generates buy and sell signals for the purpose of placing trades for futures contracts; and b) the calling of specific trades in the "Live Trade Room" in such a way as to enable clients to shadow-

trade, UBS LLC, doing business as SoT, and its successor in interest, UBS Inc.,

doing business as SoT, act as a CTA.

66.     UBS LLC, doing business as SoT, and its successor in interest, UBS

Inc., doing business as SoT, while acting as a CTA, by and through the actions of

its employees and agents, including but not limited to Dufresne and Renkow, by

using the mails or other means or instrumentalities of interstate commerce (i)

employed devices, schemes, or artifices to defraud clients or prospective clients,

and (ii) engaged in transactions, practices or courses of business which operated as

a fraud or deceit upon clients or prospective clients, in violation of 7 U.S.C. §

6o(1), by making material false and misleading statements, and omitting material

information concerning: a) the professional experience and trading success of

Dufresne; b) the profitability and performance record of SoT's trading strategies

and systems; and c) the actual nature of the trading activity purporting to take place

during SoT's "Live Trade Room," as set forth in Paragraphs 23-61 above.

67.     UBS LLC, doing business as SoT, and its successor in interest, UBS

Inc., doing business as SoT, by and through the actions of its employees and

agents, including but not limited to Dufresne and Renkow, made these

misrepresentations and failed to disclose material facts knowingly or with a

reckless disregard to their truth or falsity.

68.    Because UBS LLC's and UBS Inc.'s violations of 7 U.S.C. § 6o(1), as alleged herein, occurred in connection with statements and omissions made on the SoT website, in solicitation emails, and on social media websites, all of which are used to advertise UBS LLC's and UBS Inc.'s products and services, these violations also constitute violations of 17 C.F.R. § 4.41(a)(1)-(2).

69.    Each fraudulent misrepresentation or omission made, including those specifically alleged herein, constitutes a separate and distinct violation of 7 U.S.C. § 6o(1) and 17 C.F.R. § 4.41(a)(1)-(2).

70.    The acts and omissions of Dufresne, Renkow, and other SoT employees described in this Complaint were done within the scope of their office, employment, or agency with UBS LLC and UBS Inc.  Therefore, UBS LLC and UBS Inc. are liable as a principal for each act, omission, or failure of Dufresne, Renkow, and other SoT employees constituting violations of 7 U.S.C. § 6o(1) and 17 C.F.R. § 4.41(a)(1)-(2), pursuant to 7 U.S.C § 2(a)(1)(B) and 17 C.F.R. § 1.2.

71.    Dufresne and Renkow, directly or indirectly, controlled UBS LLC and UBS Inc.,  and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting UBS LLC's and UBS Inc.'s violations of 7 U.S.C. § 6o(1) and 17 C.F.R. §4.41(a)(1)-(2), alleged in this Complaint.  Therefore, pursuant to 7 U.S.C. § 13(b), Dufresne and Renkow are liable for each of UBS

LLC's and UBS Inc.'s violations of 7 U.S.C. § 6o(1) and 17 C.F.R. § 4.41(a)(1)-(2), alleged in this Complaint.

## COUNT II

### VIOLATION OF 17 C.F.R. §§ 4.41(a)(3) AND (b): FAILURE TO PROMINENTLY DISPLAY IN SOLICITATION MATERIAL CERTAIN REQUIRED DISCLOSURE STATEMENTS CONCERNING CLIENT TESTIMONIALS AND HYPOTHETICAL OR SIMULATED TRADING RESULTS

72.     Paragraphs 1–71 are realleged and incorporated herein by reference.

73.     17 C.F.R. § 4.41(a)(3) makes it unlawful for any CTA, or any principal thereof, to refer to any testimonial, unless the advertisement or sales literature providing the testimonial prominently discloses: (i) that the testimonial may not be representative of the experience of other clients; (ii) that the testimonial is no guarantee of future performance or success; and (iii) if, more than a nominal sum is paid, the fact that it is a paid testimonial.

74.     UBS LLC, doing business as SoT, and its successor in interest, UBS Inc., doing business as SoT, while acting as a CTA, by and through the actions of its employees and agents, including but not limited to Dufresne and Renkow, violated 17 C.F.R. § 4.41(a)(3)(i)-(ii) by referring to testimonials on SoT's website without prominently disclosing the required statement as described in Paragraphs 56-57 above.

75.     17 C.F.R. § 4.41(b) provides that no person may present the performance of any hypothetical or simulated commodity interest account, transaction in a commodity interest, or series of transactions in a commodity interest of a CTA or any principal thereof, unless a prescribed statement (stating, among other things, that the results presented are based on simulated or hypothetical performance results and that they do not represent actual trading) is disclosed prominently and in immediate proximity to the hypothetical or simulated performance being presented.

76.     UBS LLC, doing business as SoT, and its successor in interest, UBS Inc., doing business as SoT, by and through the actions of its employees and agents, including but not limited to Dufresne and Renkow, violated 17 C.F.R. § 4.41(b), in that they failed prominently to display the prescribed disclosure statements in immediate proximity to the hypothetical or simulated past performance results provided to clients and prospective clients by SoT on SoT's website, in its solicitation emails, and in video recaps of its "Live Trade Room" sessions as described in Paragraphs 58-60 above.

77.     Each failure to display prominently the required disclosure statements, including those specifically alleged herein, constitutes a separate and distinct violation of 17 C.F.R. §§ 4.41(a) (3) and (b).

78.     The failure by Dufresne and Renkow to display prominently the required disclosure statements, as described in this Complaint, was done within the scope of their office, employment, or agency with UBS LLC and UBS Inc. Therefore, UBS LLC and UBS Inc. are liable as a principal for each failure of Dufresne and Renkow constituting a violation of 17 C.F.R. § 4.41(a)(3) and (b), pursuant to 7 U.S.C § 2(a)(1)(B), and 17 C.F.R. § 1.2.

79.     Dufresne and Renkow, directly or indirectly, controlled UBS LLC and UBS Inc., and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting UBS LLC's and UBS Inc.'s violations of 17 C.F.R. § 4.41(a)(3) and (b), alleged in this Complaint.  Therefore, pursuant to 7 U.S.C. § 13(b), Dufresne and Renkow are liable for each of UBS LLC's and UBS Inc.'s violations of 17 C.F.R. § 4.41(a)(3) and (b), alleged in this Complaint.

### VII. PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that this Court, as authorized by 7 U.S.C. § 13a-1, and pursuant to its own equitable powers, enter:

a)      An order finding that Defendants violated 7 U.S.C. § 6*o*(1) and 17 C.F.R. §§ 4.41(a) and (b);

b)      An order of permanent injunction prohibiting Defendants, and any other person or entity associated with them, from engaging in conduct violative of 7 U.S.C. § 6*o*(1) and 17 C.F.R. §§ 4.41(a) and (b);

c)      An order of permanent injunction prohibiting Defendants and any on their agents, servants, employees, assigns, attorneys, and persons in active concert or participation, including any successor thereof, from, directly or indirectly:

1)      trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40) (2012));

2)      entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3(yy) (2016)) for his own personal or proprietary account or for any account in which he has a direct or indirect interest;

3)      having any commodity interests traded on their behalf;

4)      controlling or directing the trading for or on behalf of any other person or entity, whether by power of attorney or otherwise, in any account involving commodity interests;

5)      soliciting, receiving, or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

6)      applying for registration or claiming exemption from registration with the CFTC in any capacity, and engaging in any activity requiring such registration or exemption from registration with the CFTC, except as provided for in 17 C.F.R. § 4.41(a)(9) (2016);

37

7)     acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2016)), agent or other officer or employee of any person registered, exempted from registration or required to be registered with the CFTC, except as provided for in 17 C.F.R. § 4.41(a)(9) (2016); and

8)     engaging in any business activities relating to commodity interests;

d)     An order directing Defendants, as well as any successors thereof, to disgorge all benefits received, directly or indirectly, from acts or practices that constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

e)     An order requiring Defendants, as well as any successors thereof, to make full restitution to every person or entity whose funds Defendants received from the acts or practices that constitute violations of the Act and Regulations, as described herein, and pre- and post-judgment interest thereon from the date of such violations;

f)     An order directing Defendants, as well as any successors thereof, to pay a civil monetary penalty, plus post-judgment interest, in the amount of the greater of $167,728 or triple Defendants' monetary gain for each violation of the Act or Regulations;

g)   An order requiring Defendants to pay costs and fees, as permitted by 28 U.S.C. §§ 1920 and 2412(a)(2)(2012); and

h)   An order providing such other and further equitable or remedial ancillary relief as the Court may deem appropriate.


Respectfully submitted,


_/s/ James H. Holl, III_____
James H. Holl III, CA Bar #177885
jholl@cftc.gov
Michael Solinsky, DC Bar #433754
msolinsky@cftc.gov *(Pro Hac Vice Pending)*
Alan I. Edelman, DC Bar #375495
aedelman@cftc.gov *(Pro Hac Vice Pending)*
U.S. Commodity Futures Trading Commission
1155 21st Street, N.W.
Washington, D.C. 20581
Telephone: (202) 418-5000
Facsimile:  (202) 418-5987
Attorneys for Plaintiff U.S. Commodity Futures Trading Commission

Kent A. Kawakami, CA Bar #149803
kent.kawakami@usdoj.gov
United States Attorney's Office
300 N. Los Angeles Street, Room 7516
Los Angeles, California 90012
Telephone: (213) 894-4858
Facsimile:  (213) 894-2380
Local Counsel

Dated: September 30, 2016