**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**
**WESTERN DIVISION**

| | |
|---|---|
| U.S. COMMODITY FUTURES TRADING COMMISSION<br>        Plaintiff,<br><br>        v.<br><br>UNITED BUSINESS SERVICING LLC, d/b/a SCHOOLOFTRADE.COM, UNITED BUSINESS SERVICING, INC., d/b/a SCHOOLOFTRADE.COM, JOSEPH DUFRESNE, a/k/a JOSEPH JAMES, and MEGAN RENKOW, a/k/a MEGAN JAMES,<br>        Defendants. | ) Case No. 2:16-cv-07358-JAK (JCx)<br>)<br>)<br>)<br>)<br>)<br>) JS-6<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**CONSENT ORDER FOR PERMANENT INJUNCTION, RESTITUTION, CIVIL MONETARY PENALTY, AND OTHER EQUITABLE RELIEF AGAINST DEFENDANTS UNITED BUSINESS SERVICING, LLC d/b/a SCHOOLOFTRADE.COM, UNITED BUSINESS SERVICING, INC. d/b/a SCHOOLOFTRADE.COM, JOSEPH DUFRESNE a/k/a JOSEPH JAMES, and MEGAN RENKOW a/k/a MEGAN JAMES**

## I.    INTRODUCTION

On September 30, 2016, Plaintiff Commodity Futures Trading Commission

("Commission" or "CFTC") filed a Complaint against Defendants United Business

Servicing, LLC ("UBS LLC"), doing business as SchoolofTrade.com ("SoT"), United Business Servicing, Inc. ("UBS Inc."), doing business as SoT, Joseph Dufresne ("Dufresne"), also known as Joseph James, and Megan Renkow ("Renkow"), also known as Megan James (collectively, "Defendants") seeking injunctive and other equitable relief, as well as the imposition of civil penalties, for violations of the Commodity Exchange Act ("Act"), 7 U.S.C. §§ 1 *et seq.* (2012), and the Commission's Regulations ("Regulations") promulgated thereunder, 17 C.F.R. §§ 1.1 *et seq.*

## II. CONSENTS AND AGREEMENTS

To effect settlement of all charges alleged in the Complaint against them, Defendants, without a trial on the merits or any further judicial proceedings:

1. Consent to the entry of this Consent Order for Permanent Injunction, Civil Monetary Penalty, and Other Equitable Relief Against Defendants United Business Servicing, LLC, d/b/a SchoolofTrade.com, United Business Servicing, Inc., d/b/a SchoolofTrade.com, Joseph Dufresne, a/k/a Joseph James, and Megan Renkow, a/k/a Megan James ("Consent Order");

2. Affirm that they have read and agreed to this Consent Order voluntarily, and that no promise, other than as specifically contained herein, or threat, has been made by the Commission or any member, officer, agent or representative thereof, or by any other person, to induce consent to this Consent Order;

3.    Acknowledge service of the summons and Complaint;

4.    Admit the jurisdiction of this Court over them and the subject matter of this action pursuant to 7 U.S.C. § 13a-1 (2012);

5.    Admit the jurisdiction of the Commission over the conduct and transactions at issue in this action pursuant to the Act, 7 U.S.C. §§ 1 *et seq.*;

6.    Admit that venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) (2012);

7.    Waive:

(a)    Any and all claims that they may possess under the Equal Access to Justice Act, 5 U.S.C. § 504 (2012) and 28 U.S.C. § 2412 (2012), and/or the rules promulgated by the Commission in conformity therewith, 17 C.F.R. §§ 148.1 *et seq.* (2016), relating to, or arising from, this action;

(b)    Any and all claims that they may possess under the Small Business Regulatory Enforcement Fairness Act of 1996, Pub. L. No. 104-121, §§ 201-253, 110 Stat. 847, 857-868 (1996), as amended by Pub. L. No. 110-28, § 8302, 121 Stat. 112, 204-205 (2007), relating to, or arising from, this action;

(c)    Any claim of Double Jeopardy based upon the institution of this action or the entry in this action of any order imposing a civil monetary penalty or any other relief, including this Consent Order; and

(d)    Any and all rights of appeal from this action;

8.　Consent to the continued jurisdiction of this Court over them for the purpose of implementing and enforcing the terms and conditions of this Consent Order and for any other purpose relevant to this action, even if Defendants now or in the future reside outside the jurisdiction of this Court;

9.　Agree that they will not oppose enforcement of this Consent Order on the ground, if any exists, that it fails to comply with Rule 65(d) of the Federal Rules of Civil Procedure and hereby waive any objection based thereon;

10.　Agree that neither they nor any of their agents or employees under their authority or control shall take any action or make any public statement denying, directly or indirectly, any allegation in the Complaint or the Findings of Fact or Conclusions of Law in this Consent Order, or creating or tending to create the impression that the Complaint and/or this Consent Order is without a factual basis; provided, however, that nothing in this provision shall affect their: (a) testimonial obligations, or (b) right to take legal positions in other proceedings to which the Commission is not a party. Defendants shall undertake all steps necessary to ensure that all of their agents and/or employees under their authority or control understand and comply with this agreement;

11.　By consenting to the entry of this Consent Order, Defendants neither admit nor deny the allegations of the Complaint or the Findings of Fact and Conclusions of Law in this Consent Order, except as to jurisdiction and venue, which they admit. Defendants agree and intend that the allegations contained in

the Complaint and all of the Findings of Fact and Conclusions of Law contained in this Consent Order shall be taken as true and correct and be given preclusive effect, without further proof, in the course of: (a) any current or subsequent bankruptcy proceeding filed by, on behalf of, or against Defendants; and/or (b) any proceeding pursuant to 7 U.S.C. §12(a) (2012) and/or 17 C.F.R. §§3.1-3.75 (2016); and/or (c) any proceeding to enforce the terms of this Consent Order.  Defendants do not consent to the use of this Consent Order, or the Findings of Fact and Conclusions of Law in this Consent Order, as the sole basis for any other proceeding brought by the Commission;

12.    Agree to provide immediate notice to this Court and the Commission by certified mail, in the manner required by paragraph 82 of Part VI of this Consent Order, of any bankruptcy proceeding filed by, on behalf of, or against them, whether inside or outside the United States; and

13.    Agree that no provision of this Consent Order shall in any way limit or impair the ability of any other person or entity to seek any legal or equitable remedy against Defendants in any other proceeding.

### III.    FINDINGS AND CONCLUSIONS

The Court, being fully advised in the premises, finds that there is good cause for the entry of this Consent Order and that there is no just reason for delay.  The Court therefore directs the entry of the following Findings of Fact, Conclusions of Law, permanent injunction, restitution, civil monetary penalty, and equitable relief

pursuant to 7 U.S.C. § 13a-1 (2012), as set forth herein.

**THE COURT HEREBY FINDS:**

**A.    Findings of Fact**

**The Parties to This Consent Order**

14.    **Plaintiff U.S. Commodity Futures Trading Commission** is an independent federal regulatory agency charged by Congress with the responsibility for administering and enforcing the provisions of the Act and the Regulations promulgated thereunder.

15.    **Defendant United Business Servicing LLC, d/b/a SchoolofTrade.com**, was a Delaware entity formed in February 2008. At various times, UBS LLC listed its address as Los Angeles, California and San Pedro, California. From in or about late 2008 until in or about early 2012, UBS LLC described itself on the SoT website as the parent company of SoT. UBS LLC filed a Certification of Cancellation with Delaware in October 2012. UBS LLC has never been registered with the CFTC in any capacity.

16.    **Defendant United Business Servicing Inc., d/b/a SchoolofTrade.com**, is a Delaware corporation, incorporated in July 2011. In November 2011, UBS Inc. registered as a foreign corporation in California. UBS Inc.'s California incorporation record lists its address as Redondo Beach, California. UBS Inc. is the successor in interest to UBS LLC. Since in or about early 2012, UBS Inc. has described itself on the SoT website as the parent

company of SoT.  UBS Inc. has never been registered with the CFTC in any capacity.

17.     **Defendant Joseph Dufresne,** who uses the name Joseph James in connection with his activities related to SoT, currently resides in Palos Verdes Estates, California.  Dufresne is the husband of Defendant Renkow.  At various times during the Relevant Period, Dufresne has held himself out as the Owner, Founder, CEO, and Head Trader of SoT.  Dufresne has never been registered with the CFTC in any capacity.

18.     **Defendant Megan Renkow,** who uses the name Megan James in connection with her activities related to SoT, resides in Palos Verdes Estates, California.  Renkow is the wife of Defendant Dufresne.  Renkow has never been registered with the CFTC in any capacity.

**Defendants Made Fraudulent Solicitations**

19.     Renkow formed UBS LLC in Delaware in February 2008.  She is listed as the sole Member on UBS LLC's formation papers, although in a document executed in September 2008, and again in a similar document in June 2009, Renkow confirmed that Dufresne was an officer of the company and had full access to company accounts and full authority over the operations of the company.

20.     The SoT website (www.schooloftrade.com) first appeared in or about late 2008.  The website at that time listed UBS LLC as the parent company of SoT.

21.     UBS Inc. was incorporated in Delaware in July 2011.  In November 2011, Renkow registered UBS Inc. as a foreign corporation in California. According to UBS Inc.'s California corporation records, Renkow is the President, Chief Executive Officer, Secretary, and Chief Financial Officer of UBS Inc.  In a document dated January 2012, Renkow stated that she is the "sole 100% owner of all shares and interest in United Business Servicing Inc."

22.     As late as January 2012, UBS LLC continued to be listed as the parent company on the SoT website; however, sometime between January 2012 and March 2012, the SoT website was changed to reflect UBS Inc. as the parent company of SoT.  In or about September 2012, Renkow filed a Certificate of Cancellation for UBS LLC with the state of Delaware.  The cancellation was granted in or about October 2012.

23.     Since at least October 2011, and continuing through at least September 30, 2016 (the "Relevant Period"), Defendants have operated the SoT website through which they have solicited members of the public to purchase memberships in SoT that allow them varying degrees of access to trading strategies and systems to be used for trading commodity futures contracts.  Defendants demonstrate how to use these trading strategies and systems through seminars, training videos, one-on-one training sessions, and access to a "Live Trading Room."

24. SoT offers three levels of membership: a) a Beginner Membership for the price of $249.99 per month; b) an Intermediate Membership for a one-time price of $2,499.00 plus $99 per month after six months; and c) a lifetime Advanced Membership for a one-time price of $4,999.00. The Intermediate and Advanced levels of membership offer clients access to an increasing number of trading strategies beyond the Beginner level.

25. Purchasers of the Beginner Membership have access to SoT's trading newsletter (available through a link on the SoT website), as well as a limited number of tutorials and strategies focused on the basics of trading.

26. Purchasers of the Intermediate Membership have all of the benefits of the Beginner Membership, as well as access to a broader array of tutorials and strategies.

27. Purchasers of both the Intermediate and Advanced memberships have access to a customizable automated trading system. According to its website, SoT offers "3 different fully-automated and semi-automated trading systems for our clients to make money on any market, any time of the day" that "[use] cutting-edge algorithmic trading technology […] that will allow our computer to do the trading for us [sic]." At various times during the Relevant Period, both Intermediate and Advanced memberships also included a Professional Trading Plan, which, according to the "Frequently Asked Questions" section of the SoT website, is a

"personalized trade plan focusing on the best trading opportunities according to your trading times."

28.     Purchasers of the Advanced Membership also have access to what SoT describes as "Concierge Services." These services include, among other things, one-on-one training sessions and technical support, for which a client pays an hourly fee.

29.     The most highly touted benefit of Advanced Membership is access to SoT's "Live Trade Room." According to the SoT website, this is "the most important part of the Advanced Membership." The "Live Trade Room" is a video feed that Advanced Members can access through their computers or other streaming devices. The SoT website describes the "Live Trade Room" as a place where clients can follow Dufresne as he engages in "'live trades' called with exact entry and exit information using [SoT's] proprietary indicators, templates, and strategies."

30.     During the Relevant Period, SoT sold approximately 877 memberships and took in at least $2,776,994. From January through April 2016, SoT averaged nineteen (19) new clients per month and approximately $60,000 per month in revenue from sales of memberships.

31.     During the Relevant Period, Defendants marketed SoT's products and services through, among other methods, the SoT website, seminars open to the public, marketing emails, and various social media sites such as Twitter, Facebook,

and YouTube. These products and services were marketed to clients as tools that would enable them to make money trading commodity futures contracts and Defendants touted the likelihood of profits that could be gained by using them. For example, among the statements Defendants made on the SoT website, in emails to clients, and in social media are the following:

a. In a May 9, 2012 posting to the webpage www.schooloftrade-review-diet.com, Dufresne states, "There is NOTHING more powerful than learning by DOING with me every day, and **you will make an average of 30 ticks per day in the first 10 days of my 'plan' so you will make money while you learn** the ropes" (emphasis added)

b. In a February 2014 email response to a potential client who inquired about his ability to make back the cost of his SoT membership through trading with Dufresne, Renkow states, "If you trade with JJ 16 trading days per month **it will take you a little over one month to recoup your total investment**" (emphasis added)

32. One of the major selling points employed by Defendants in marketing SoT is the purported experience and success of Dufresne as a trader. A webpage on SoT's website titled "Meet the Team" listed Dufresne at the top and referred to him as a "Professional Trader… [who] specializes in intra-day trading of crude oil, Euro, Gold and E-Mini Russell Futures Markets along with the Major Forex Pairs." The SoT Blog (which is accessed from a link on the main webpage of the SoT website) provided a link to Dufresne's page on the LinkedIn.com website. As late as August 2015, that page, which purported to provide a resume of Dufresne's professional background, stated, among other things that:

a. Dufresne "has been trading Futures and FOREX since the year 2000"

b. "After 3 years of very successful trading, [Dufresne] opened his first Hedge Fund in 2003"

c. Dufresne has been a "Professional Day Trader" at Vantage Capital Advisers LLC in Los Angeles since 2000

d. Dufresne received an award as "Trader of the Year" in 2001

e. Dufresne was named to the "Top 30 under 30" by Professional Trader Monthly in 2006

33. Defendants also touted Dufresne's experience in solicitation emails to prospective clients, including the following:

a. In an October 20, 2014 solicitation email, Dufresne states, "What if you had **a 14-year, professional trader** helping you every step of the way?" (emphasis added)

b. In an October 24, 2014 solicitation email, Dufresne states, "Trend-Following has been our '_bread-and-butter_' **for over 10 years**" (emphasis added); and

34. All of these statements regarding Dufresne's background and experience as a trader are false and misleading. Dufresne has not been a professional trader since 2000, nor has he been recognized for his trading acumen as described above. In fact, prior to 2007, not only was Dufresne not a professional trader, he had no trading experience whatsoever. In September 2007, Dufresne opened two trading accounts – one specifically for futures trading and one specifically for foreign exchange trading – in his own name with a registered Futures Commission Merchant ("FCM"). In the account application documents for

each account, Dufresne was required to list his trading experience. Each application asked for the number of years' experience he had trading stocks, options, futures, and forex. Dufresne responded "none" for each category on each application. The applications also asked for the number of trades executed in each of these categories in an average month. Again, Dufresne responded "none" for each category on each application.

35.     In October 2008, Dufresne submitted an application to the National Futures Association ("NFA"), the futures industry's self-regulatory organization, for registration as a Principal of an entity called Vantage Capital Management LLC ("Vantage"). At the time, Vantage had a pending application with the NFA to be registered as a Commodity Trading Advisor ("CTA"). In his application – which Dufresne was required to verify as "true, complete, and accurate and… not misleading in any material respect…." – Dufresne was required to list his employment history. For the period June 1999 to November 2007, Dufresne listed his employment as including jobs as a maintenance worker at a country club, a front desk operator at a fitness center, a student worker at Arizona State University, and a loan officer, sales manager, or owner at various mortgage companies. Dufresne's application also stated that for the period November 2007 to October 2008, he was unemployed. Nowhere in his application did Dufresne state that he had been a professional day trader at Vantage Capital Advisers LLC since 2000, or

that he had been in charge of a hedge fund since 2003. In February 2009, both Dufresne and Vantage withdrew their applications with the NFA.

36. Dufresne's claims to have been a professional trader and hedge fund operator are also belied by the fact that he was incarcerated for six months in 2005, following a conviction on a felony charge.

37. Defendants not only touted Dufresne's experience as a trader, they also touted his trading success, purposefully creating the impression among prospective clients that Dufresne is able to live an extravagant lifestyle as a result of the trading success he has achieved using the strategies he is offering to clients. Among the statements made to this effect are the following:

    a. In a May 12, 2012 posting on the webpage www.schooloftrade-review.com, Dufresne states, "Traders Lifestyle: we love to trade, and **we live a great lifestyle from our profits**" (emphasis added)

    b. In a November 17, 2014 posting on his Facebook page (a link to which is included on the SoT website), Dufresne states, "LOL… old school traders always tell me these charts dont (sic) work… **until they see my bank account!**" (emphasis added)

    c. In a July 20, 2015 posting to his Twitter page (a link to which is included on the SoT website), Dufresne states, "Thank you #CrudeOil **for paying my bills for me today!** Love those #Traps!" (emphasis added)

38. All of these statements are false and misleading. Dufresne has never been a profitable trader. Dufresne has held himself out as SoT's Head Trader; however, SoT has never had a trading account in its name. Between September

2007 and April 2016, UBS LLC and UBS Inc. (the parent company and successor in interest parent company of SoT) opened a combined twelve (12) trading accounts in their names. Of these twelve accounts, only four (4) appear to have had any trading activity. None of those four accounts was profitable on an individual basis and the accounts incurred combined gross losses of $6,985 and combined net losses of $9,765.14. During the same time period, Dufresne opened two trading accounts in his own name and two other trading accounts in the name of Lending Hands LLC ("Lending Hands"), a business of which he was indirectly the owner. Dufresne never funded the two accounts in his own name. The two accounts in the name of Lending Hands incurred gross losses of $99,377.50 and net losses of $109,258.98. Moreover, the records of the trading accounts with which Dufresne has been associated show that, contrary to his claims on July 20, 2015, there were no profitable trades and, indeed, no trades at all, on that day in any of those accounts.

39. Defendants also touted the profitability and performance of their trading strategies and systems. For example:

a. In a May 18, 2012 solicitation email, Dufresne states, "This morning we finished up a record breaking week, **earning over $10,000 in profits this week alone**… This is a true testament to the effectiveness of our trading method…." (emphasis added)

b. In a May 19, 2015 on-line chat with a disgruntled client who was questioning the actual success of Dufresne's trading, Renkow states, "…last week we didn't have any losing trades at all for 4 of the days."

40.     At various times during the Relevant Period, Defendants directly provided clients and potential clients with the performance record of SoT's automated trading systems.  For example, on October 30, 2013, Renkow sent copies to a potential client of the 2012 and 2013 performance records for SoT's "auto-trader."  On March 18, 2014, Renkow sent another potential client a copy of the performance record for SoT's "FLEX Auto-Trader" for 2012 and 2013.  At various other times, Defendants posted the performance record of SoT's automated trading systems on the SoT website's "Blog," which is accessible to the general public through a link on the website's main webpage.  Those records claimed the following results for SoT's Auto-Trader program:

        a.      In 2011, $169,935 in profits;

        b.      In 2012, $114,675 in profits; and

        c.      In 2013, $156,150 in profits.

41.     Defendants have stated on numerous occasions that their automated trading system results were obtained in a funded trading account.  On September 26, 2013, Defendants posted the following to the webpage www.schooloftrade-review-membership.com: "**Are these strategies back-tested? Are you trading with real money? YES.** Our automated trading systems are back-tested, forward-tested, and currently running on LIVE trade accounts." (emphasis in original)  At least as late as June 24, 2014, the SoT website contained the following statements

in its "Frequently Asked Questions" section: "**Are the Auto Trader results, Live Results?** - Yes, the auto trader results we post are indeed taken in a LIVE environment on a LIVE account. We use the same auto trader ourselves that we provide to our members." (emphasis in original)

42.     At various times during the Relevant Period, Defendants also posted in the Member's section of the SoT website, or otherwise distributed, other performance records for SoT.  Those records claimed the following results:

        a.     In 2011, $411,715 in profits;

        b.     In 2012, $433,861 in profits;

        c.     In 2013, $491,145 in profits;

        d.     In 2014, $626,864 in profits; and

        e.     In 2015, $716,104 in profits.

43.     The profit claims made in SoT's solicitations and in its performance records, as set forth above, are false and misleading.  SoT has never had any trading accounts in its name and none of the accounts in the name of either UBS LLC or UBS Inc. has ever been profitable.  Moreover, UBS LLC and UBS Inc. account records fail to support any of the specific claims of profits cited by Defendants.

44.     Defendants operate the "Live Trade Room" to show clients how to apply SoT's strategies in the markets.  Defendants have described the "Live Trade Room" on the SoT website as "a web-based trading room where we watch charts,

call trades, teach our strategies, and answer questions that are typed into the chat box."

45.     During the Relevant Period, Defendants also promoted the "Live Trade Room" as a place where clients can make money by shadow-trading the trades announced in the session.  On May 9, 2012, Dufresne posted the following statement to the webpage www.schooloftrade-review-diet.com (which, at the time, was accessible through the SoT website): "In our trade room, I provide our members with the exact entry, stop loss, and profit targets SPECIFICALLY so that my new traders (following the trade plan) can shadow-trade with me during their learning process."  At least as late as June 2014, the SoT website contained the following language with regard to the "Live Trade Room": "Benefit from Shadow-trading opportunities while you learn to master your skills of professional trading. Make money the very first day with easy-to-follow trade calls which provide EXACT information such as entry price, stop-loss and profit-targets.  You'll be amazed how quickly you will learn by participating in our Live Trade Room with professionals."

46.     Many, if not most, sessions of the "Live Trade Room" are run by Dufresne, although there are some sessions in which other SoT employees appear.

47.     Communication between Dufresne and clients in the "Live Trade Room" consists of: a) a chat room component, through which clients may submit questions; b) an audio component, through which clients hear Dufresne answer

questions and announce trades; and c) a video component, through which clients see trading charts and other visual aids.

48.     During the Relevant Period, Defendants purported that the activity in the "Live Trade Room" is happening in real time.  For example:

    a.    In a promotional video titled "Join our Trade Room," that was posted to SoT's YouTube channel on July 26, 2014, Dufresne invites viewers to join him in the "Live Trade Room," where he will show trading "in real time."

    b.    In a video titled "Simple Day trading strategy earns profit on any futures market," that was posted to the SoT YouTube channel on May 21, 2013, Dufresne says, "I'm a teacher, but I'm also a trader.  In fact, from what I'm told I'm one of the only people that moderates a trade room, right, trades live, and teaches in real time."

    c.    In an April 28, 2014 solicitation email, Dufresne states, "I teach our students every morning in our Live Trade Room how to find the best times and locations to find a price reversal and **then I call the trade in real time** with exact entry and exit so everyone can profit alongside me!" (emphasis in original)

49.     During the Relevant Period, Defendants also created the impression that the trading being done in the "Live Trade Room" was being done with a real, funded account and that Defendants were making real money as a result of the trades announced in the "Live Trade Room."  Indeed, this was a major component of Defendants' solicitations, both in emails to clients and in video recaps of the "Live Trade Room" which were posted to SoT's YouTube Channel and were, in essence, a means of advertising Defendants' products and services.  For example:

a.   In a video titled "Simple Day Trading Strategy Earns Profit on Any Futures Market," posted on May 21, 2013, Dufresne states, "Just had a question come in from a guest here this afternoon that said 'Why we don't trade the S&P more often?' […] I tell you, I have a hard time getting to the S&P, **tripping over all these bags of cash we keep making** on the Euro, the gold, the Russell and Crude Oil." (emphasis added)

c.   At least as late as June 2014, SoT's website contained the following statement: "Follow along with professional traders as they use Daily Price Levels and our Trading Plan **to take real trades on real trade accounts.**" (emphasis added)

c.   In a November 16, 2014 email to a complaining client, Dufresne states, "**We earned over $500** both days you attended our Live-Trade-Room.  Our students made money with me. …Let me be clear… **I trade a live account.**" (emphasis added)

50.   All of these statements regarding executing trades in a "real" or "live" trading account and money made in the "Live Trade Room" are false and misleading.  SoT has never had any trading accounts in its name and none of the accounts in the name of either UBS LLC or UBS Inc. has ever been profitable.

**Defendants Failed To Prominently Display in Their Solicitation Material Certain Required Disclosure Statements Concerning Client Testimonials and Hypothetical or Simulated Trading Results**

51.   The SoT website includes a webpage on which Defendants display client testimonials.

52.   As late as October 2015, the SoT webpage on which client testimonials are displayed failed to include the language required under 17 C.F.R § 4.41(a)(3)(i)-(ii).  It was not until sometime in or about 2016 that Defendants began including the required language on the webpage.  Even after it was included,

however, the language was not displayed prominently; rather, it could only be found by scrolling all the way down to the very bottom of the webpage.

53. On their website, in their solicitation emails, and in their video recaps of the "Live Trade Room," Defendants advertised performance results that were – at best – based on hypothetical or simulated trading. While the SoT website did include language relating to hypothetical or simulated performance, such language could only be found by scrolling down to the very bottom of the website's main webpage and then clicking on a link entitled "Terms & Conditions" that is located in the footer of the webpage. That link leads the reader to a new webpage. The reader must then scroll about half-way down this webpage before he finds the language relating to hypothetical or simulated performance. The language is not displayed prominently, nor is it displayed in immediate proximity to the performance results advertised for the automated trading program or the other performance results. Moreover, the language displayed does not include the following statements, which are required under 17 C.F.R. § 4.41(b): "These results are based on simulated or hypothetical performance results that have certain inherent limitations. Unlike the results shown in an actual performance record, these results do not represent actual trading."

54. None of the solicitation emails cited above, which touted profits earned, contained any language relating to hypothetical or simulated performance.

55.     At least some of the video recaps of the "Live Trade Room" posted to SoT's YouTube channel, failed to contain any statement relating to hypothetical or simulated performance. It was not until sometime in or about late 2012, when Defendants began posting language on the webpage containing a new video (although not in the video itself) relating to hypothetical or simulated performance; however, this language could only be found by clicking on a link on the webpage entitled "Show More." It was not until in or about April 2016, when Defendants began posting a banner with language relating to hypothetical or simulated performance at the beginning of each new video on SoT's YouTube webpage. Again, however, neither the language posted on the webpage beginning in 2012, nor the language posted at the beginning of the new videos beginning in 2016, included the prescribed statement that these specific results are based on simulated or hypothetical performance results and that they do not represent actual trading.

**Dufresne and Renkow Are Control Persons of UBS LLC and UBS Inc.**

56.     At all times during the Relevant Period Dufresne and Renkow were control persons of UBS LLC and UBS Inc. Dufresne, along with Renkow, exercised control over the day-to-day operations of both UBS LLC and UBS Inc., which consisted primarily, if not solely, of the operation of SoT. Indeed, Dufresne, at various times, has held himself out as the Owner, Founder, CEO, and Head Trader of SoT. According to documents executed by Renkow, Dufresne was an officer of UBS LLC and had full access to company accounts and full authority

over the operations of UBS LLC. He is a signatory and/or authorized trader on at least some, if not all, of UBS LLC's and UBS Inc.'s bank accounts and trading accounts. Renkow was the sole Member of UBS LLC, and is the President, Chief Executive Officer, Secretary, and Chief Financial Officer of UBS Inc. Along with Dufresne, she exercised control over the day-to-day operations of UBS LLC and UBS Inc., which consisted primarily, if not solely, of the operation of SoT. She is a signatory on at least some, if not all, of UBS LLC's and UBS Inc.'s bank accounts and trading accounts.

**B.** **Conclusions of Law**

**Jurisdiction and Venue**

57. This Court has jurisdiction over this action pursuant to 7 U.S.C. § 13a-1 (2012), which provides that whenever it shall appear to the Commission that any person has engaged, is engaging, or is about to engage in any act or practice constituting a violation of any provision of the Act or any rule, regulation, or order promulgated thereunder, the Commission may bring an action in the proper district court of the United States against such person to enjoin such act or practice, or to enforce compliance with the Act, or any rule, regulation or order thereunder.

58. Venue properly lies with this Court pursuant to 7 U.S.C. § 13a-1(e) (2012), because the Defendants reside in this jurisdiction and the transactions, acts,

practices, and courses of business alleged to have violated the Act occurred within this District.

### UBS LLC, Doing Business as SoT, and Its Successor in Interest, UBS Inc., Doing Business as SoT, Acted as a Commodity Trading Advisor

59.     7 U.S.C. § 1a(6) (2012) defines a CTA as any person who, for compensation or profit, engages in the business of advising others, either directly or through publications, writings, or electronic media, as to the value of or the advisability of trading in any contract of sale of a commodity for future delivery made or to be made on or subject to the rules of a contract market.  By the conduct described above, UBS LLC, doing business as SoT, and its successor in interest, UBS Inc., doing business as SoT, acted as a CTA.

### Violation of 7 U.S.C. § 6$o$(1)(2012): Fraud by a Commodity Trading Advisor

60.     By the conduct described above, UBS LLC, doing business as SoT, and its successor in interest, UBS Inc., doing business as SoT, while acting as a CTA, by and through the actions of its employees and agents, including but not limited to Dufresne and Renkow, by using the mails or other means or instrumentalities of interstate commerce (i) employed devices, schemes, or artifices to defraud clients or prospective clients, and (ii) engaged in transactions, practices or courses of business which operated as a fraud or deceit upon clients or prospective clients, in violation of 7 U.S.C. § 6$o$(1), by making material false and misleading statements, and omitting material information concerning: a) the

professional experience and trading success of Dufresne; b) the profitability and performance record of SoT's trading strategies and systems; and c) the actual nature of the trading activity purporting to take place during SoT's "Live Trade Room."

**Violation of 17 C.F.R. § 4.41(a)(1)-(2)(2016): Fraudulent Advertising by a Commodity Trading Advisor**

61.　By the conduct described above, UBS LLC, doing business as SoT, and its successor in interest, UBS Inc., doing business as SoT, while acting as a CTA, by and through the actions of its employees and agents, including but not limited to Dufresne and Renkow, advertised in a manner which (i) employed devices, schemes, or artifices to defraud clients or prospective clients; and (ii) involved transactions, practices, or courses of business which operated as a fraud or deceit upon clients or prospective clients, in violation of 17 C.F.R. § 4.41(a)(1)-(2), by making material false and misleading statements, and omitting material information concerning: a) the professional experience and trading success of Dufresne; b) the profitability and performance record of SoT's trading strategies and systems; and c) the actual nature of the trading activity purporting to take place during SoT's "Live Trade Room."

**Violation of 17 C.F.R. §§ 4.41(a)(3)(i)-(ii)(2016): Failure to Prominently Display in Solicitation Material Certain Required Disclosure Statements Concerning Client Testimonials**

62.     By the conduct described above, UBS LLC, doing business as SoT, and its successor in interest, UBS Inc., doing business as SoT, while acting as a CTA, by and through the actions of its employees and agents, including but not limited to Dufresne and Renkow, violated 17 C.F.R. § 4.41(a)(3)(i)-(ii) by referring to testimonials on SoT's website without prominently disclosing that: (1) the testimonials may not be representative of the experience of other clients; and (2) the testimonials are no guarantee of future performance or success.

**Violation of 17 C.F.R. §§ 4.41(b)(2016): Failure to Prominently Display in Solicitation Material Certain Required Disclosure Statements Concerning Hypothetical or Simulated Trading**

63.     By the conduct described above, UBS LLC, doing business as SoT, and its successor in interest, UBS Inc., doing business as SoT, by and through the actions of its employees and agents, including but not limited to Dufresne and Renkow, violated 17 C.F.R. § 4.41(b), in that they failed prominently to display a disclosure statement in conformity with 17 C.F.R. §§ 4.41(b)(1) and (2) in immediate proximity to the hypothetical or simulated past performance results provided to clients and prospective clients by SoT on SoT's website, in its solicitation emails, and in video recaps of its "Live Trade Room" sessions.

**Dufresne and Renkow Controlled UBS LLC and UBS Inc.**

64.     Dufresne and Renkow, directly or indirectly, controlled UBS LLC and UBS Inc., and did not act in good faith or knowingly induced, directly or indirectly, the acts constituting UBS LLC's and UBS Inc.'s violations of 7 U.S.C. § 6*o*(1) and 17 C.F.R. §§ 4.41(a) and (b); therefore, pursuant to 7 U.S.C. § 13c(b) (2012), Dufresne and Renkow are liable for UBS LLC's and UBS Inc.'s violations of 7 U.S.C. § 6*o*(1) and 17 C.F.R. §§ 4.41(a) and (b).

65.     The foregoing acts, omissions, and failures of Dufresne and Renkow occurred within the scope of their employment, office, or agency with UBS LLC and UBS Inc.; therefore, pursuant to 7 U.S.C. § 2(a)(1)(B)(2012), and, 17 C.F.R. § 1.2 (2016), UBS LLC and UBS Inc. are liable for Dufresne's and Renkow's acts, omissions, and failures in violation of 7 U.S.C. § 6*o*(1) and 17 C.F.R. §§ 4.41(a) and (b).

66.     Unless restrained and enjoined by this Court, there is a reasonable likelihood that the Defendants will continue to engage in the acts and practices alleged in the Complaint and in similar acts and practices in violation of 7 U.S.C. § 6*o*(1) and 17 C.F.R. §§ 4.41(a) and (b).

## IV.   PERMANENT INJUNCTION

**IT IS HEREBY ORDERED THAT:**

67.   Based upon and in connection with the foregoing conduct, pursuant to 7 U.S.C. § 13a-1, Defendants are permanently restrained, enjoined and prohibited from directly or indirectly:

    a.    Violating 7 U.S.C. §6$o$(1) when acting as a commodity trading advisor, or associated person of a commodity trading advisor by use of the mails or any means or instrumentality of interstate commerce, by directly or indirectly employing any device, scheme, or artifice to defraud any client or prospective client, or by engaging in any practice, or course of business which operates as a fraud or deceit upon any client or prospective client by making fraudulent misrepresentations or omissions;

    b.    Violating 17 C.F. R. § 4.41(a)(1)-(2), which makes it unlawful for a CTA, or any principal thereof,  to advertise in a manner which: (1) employs any device, scheme or artifice to defraud any client or prospective client; or (2) involves any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client;

    c.    Violating 17 C.F.R. § 4.41(a)(3)(i)-(ii), which makes it unlawful for a

commodity trading advisor, or any principal thereof, to advertise in a manner which refers to any testimonial, unless the advertisement or sales literature providing the testimonial prominently discloses, among other things, that: (1) the testimonial may not be representative of the experience of other clients; and (2) the testimonial is no guarantee of future performance or success; and/or

d.   Violating 17 C.F.R. § 4.41(b), which provides that no person may present the performance of any simulated or hypothetical commodity interest account, transaction in a commodity interest or series of transactions in a commodity interest of a commodity trading advisor, or any principal thereof, unless such performance is accompanied by statements in conformity with 17 C.F.R. § 4.41(b)(1) and (b)(2) .

68.   Defendants are also permanently restrained, enjoined and prohibited from directly or indirectly:

a.   Trading on or subject to the rules of any registered entity (as that term is defined in 7 U.S.C. § 1a(40)(2012));

b.   Entering into any transactions involving "commodity interests" (as that term is defined in 17 C.F.R. § 1.3(yy)(2016) for Defendants' personal or proprietary account or for any account in which Defendants have a direct or indirect interest;

c.   Having any commodity interests traded on any Defendants' behalf;

d. Controlling or directing the trading for, or on behalf of, any other person or entity, whether directly or indirectly, by power of attorney or otherwise, in any account involving commodity interests;

e. Soliciting, receiving or accepting any funds from any person for the purpose of purchasing or selling any commodity interests;

f. Applying for registration or claiming exemption from registration with the Commission in any capacity, and engaging in any activity requiring such registration or exemption from registration with the Commission, except as provided for in 17 C.F.R. § 4.14(a)(9)(2016); and/or

g. Acting as a principal (as that term is defined in 17 C.F.R. § 3.1(a) (2016)), agent or any other officer or employee of any person (as that term is defined in 7 U.S.C. § 1a(38)(2012)), or entity registered, exempted from registration or required to be registered with the Commission.

69. If Defendants act as a commodity trading advisor that does not direct client accounts or provide commodity trading advice based on, or tailored to, the commodity interest or cash positions or other circumstances or characteristics of particular clients, as provided for in 17 C.F.R. § 4.14(a)(9):

a. Defendants shall first:

i. Provide a copy of this Consent Order to any prospective client; and

ii. Obtain and keep a record of an acknowledgement signed

and dated by the prospective client stating that the client received the Disclosure.

b.   Defendants shall produce such written acknowledgement to any Commission representative upon the representative's request.

## V.   RESTITUTION AND CIVIL MONETARY PENALTIES

**IT IS FURTHER ORDERED THAT:**

**A.   Restitution**

70.   Defendants shall pay, jointly and severally, restitution in the amount of three million nine hundred forty-one thousand and one hundred fifty-seven dollars ($3,941,157) ("Restitution Obligation"), plus post-judgment interest, within ten days of the entry of this Consent Order.  If the Restitution Obligation is not paid in full within ten (10) days of the date of entry of this Consent Order, then post-judgment interest shall accrue on the Restitution Obligation beginning on the date of entry of this Consent Order and shall be determined by using the Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961 (2012).

71.   To effect payment of the Restitution Obligation and the distribution of any restitution payments to Defendants' clients, the Court appoints the National Futures Association ("NFA") as Monitor ("Monitor").  The Monitor shall collect

payments of the Restitution Obligation from Defendants and make distributions as set forth below. Because the Monitor is acting as an officer of this Court in performing these services, the NFA shall not be liable for any action or inaction arising from NFA's appointment as Monitor, other than actions involving fraud.

72. Defendants shall make their payments of the Restitution Obligation under this Consent Order to the Monitor in the name "UBS LLC, UBS Inc., Joseph Dufresne, and Megan Renkow–Settlement Fund" and shall send such payments by electronic funds transfer, or by U.S. postal money order, certified check, bank cashier's check, or bank money order, to the Office of Administration, National Futures Association, 300 South Riverside Plaza, Suite 1800, Chicago, Illinois 60606 under cover letter that identifies the paying Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581, as well as to Senior Trial Attorney Alan I. Edelman, CFTC, 1155 21st Street, NW, Washington, DC 20581.

73. The Monitor shall oversee the Defendants' Restitution Obligation and shall have the discretion to determine the manner of distribution of such funds in an equitable fashion to Defendants' clients identified by the Commission or may defer distribution to eligible clients until such time as the Monitor deems

appropriate.  In the event that the amount of Restitution Obligation payments to the Monitor are of a *de minimis* nature, such that the Monitor determines that the administrative cost of making a distribution to eligible clients is impractical, the Monitor may, in its discretion, treat such restitution payments as civil monetary penalty payments, which the Monitor shall forward to the Commission following the instructions for civil monetary penalty payments set forth in Section B of Part V below.

74.     Defendants shall cooperate with the Monitor as appropriate to provide such information as the Monitor deems necessary and appropriate to identify Defendants' clients to whom the Monitor, in its sole discretion, may determine to include in any plan for distribution of any Restitution Obligation payments. Defendants shall execute any documents necessary to release funds that they have in any repository, bank, investment or other financial institution, wherever located, in order to make partial or total payment toward the Restitution Obligation.

75.     The Monitor shall provide the Commission at the beginning of each calendar year with a report detailing the disbursement of funds to Defendants' clients during the previous year.  The Monitor shall transmit this report under a cover letter that identifies the name and docket number of this proceeding to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC  20581.

76.     The amounts payable to each client shall not limit the ability of any client to prove that a greater amount is owed from Defendants or any other person or entity, and nothing herein shall be construed in any way to limit or abridge the rights of any client that exist under state or common law.

77.     Pursuant to Rule 71 of the Federal Rules of Civil Procedure, each client of Defendants who suffered a loss is explicitly made an intended third-party beneficiary of this Consent Order and may seek to enforce obedience of this Consent Order to obtain satisfaction of any portion of the restitution that has not been paid by Defendants to ensure continued compliance with any provision of this Consent Order and to hold Defendants in contempt for any violations of any provision of this Consent Order.

78.     To the extent that any funds accrue to the U.S. Treasury for satisfaction of Defendants' Restitution Obligation, such funds shall be transferred to the Monitor for disbursement in accordance with the procedures set forth above.

**B.      Civil Monetary Penalty**

79.     Defendants shall pay, jointly and severally, a civil monetary penalty ("CMP Obligation") in the amount of one million dollars ($1,000,000), plus post-judgment interest, within ten (10) days of the date of the entry of this Consent Order.  Post-judgment interest shall accrue on the CMP Obligation beginning on the date of entry of this Consent Order and shall be determined by using the

Treasury Bill rate prevailing on the date of entry of this Consent Order pursuant to 28 U.S.C. § 1961.

80. Defendants shall pay the CMP Obligation by electronic funds transfer, U.S. postal money order, certified check, bank cashier's check, or bank money order. If payment is to be made other than by electronic funds transfer, then the payment shall be made payable to the Commodity Futures Trading Commission and sent to the address below:

> Commodity Futures Trading Commission
> Division of Enforcement
> ATTN: Accounts Receivable
> DOT/FAA/MMAC/AMZ-341
> CFTC/CPSC/SEC
> 6500 S. MacArthur Blvd.
> Oklahoma City, OK 73169
> (405) 954-7262 office
> (405) 954-1620 fax
> nikki.gibson@faa.gov

If payment by electronic funds transfer is chosen, Defendants shall contact Nikki Gibson or her successor at the address above to receive payment instructions and shall fully comply with those instructions. Defendants shall accompany payment of the CMP Obligation with a cover letter that identifies Defendants and the name and docket number of this proceeding. Defendants shall simultaneously transmit copies of the cover letter and the form of payment to the Chief Financial Officer, Commodity Futures Trading Commission, Three Lafayette Centre, 1155 21st Street, NW, Washington, DC 20581.

**Provisions Related to Monetary Sanctions**

81.     Partial Satisfaction:  Acceptance by the Commission or the Monitor of any partial payment of Defendants' Restitution Obligation or CMP Obligation shall not be deemed a waiver of their respective obligation requirement to make further payments pursuant to this Consent Order, or a waiver of the Commission's right to seek to compel payment of any remaining balance.

## VI.     MISCELLANEOUS PROVISIONS

82.     Notice:  All notices required to be given by any provision in this Consent Order shall be sent certified mail, return receipt requested, as follows:

Notice to Commission:

> Director
> Division of Enforcement
> Commodity Futures Trading Commission
> 1155 21st Street, N.W.
> Washington, DC 20581

Notice to Defendants UBS LLC, UBS, Inc., Joseph Dufresne, and Megan Renkow:

> c/o Gregory J. Morrow, Esq.
> 10401 Wilshire Boulevard
> Suite 1102
> Los Angeles, California 90024

All such notices to the Commission shall reference the name and docket number of this action.

83. Change of Address/Phone:  Until such time as Defendants satisfy in full their Restitution Obligation and CMP Obligation as set forth in this Consent Order, Defendants shall provide written notice to the Commission by certified mail of any change to their telephone number and/or mailing address within ten (10) calendar days of the change.

84. Entire Agreement and Amendments:  This Consent Order incorporates all of the terms and conditions of the settlement among the parties here to date. Nothing shall serve to amend or modify this Consent Order in any respect whatsoever, unless: (a) reduced to writing; (b) signed by all parties hereto; and (c) approved by order of this Court.

85. Invalidation:  If any provision of this Consent Order or if the application of any provision or circumstance is held invalid, then the remainder of this Consent Order and the application of the provision to any other person or circumstance shall not be affected by the holding.

86. Waiver:  The failure of any party to this Consent Order or of any client at any time to require performance of any provision of this Consent Order shall in no manner affect the right of the party or client at a later time to enforce the same or any other provision of this Consent Order.  No waiver in one or more instances of the breach of any provision contained in this Consent Order shall be deemed to be or construed as a further or continuing waiver of such breach or waiver of the breach of any other provision of this Consent Order.

87.    Continuing Jurisdiction of this Court:  This Court shall retain jurisdiction of this action to ensure compliance with this Consent Order and for all other purposes related to this action, including any motion by Defendants to modify or for relief from the terms of this Consent Order.

88.    Injunctive and Equitable Relief Provisions: The injunctive and equitable relief provisions of this Consent Order shall be binding upon Defendants, upon any person under their authority or control, and upon any person who receives actual notice of this Consent Order, by personal service, e-mail, facsimile or otherwise insofar as he or she is acting in active concert or participation with Defendants.

89.    Authority:  Megan Renkow hereby warrants that she is the sole Member of United Business Servicing, LLC, and that she is duly empowered to sign and submit this Consent Order on behalf of UBS LLC.  Megan Renkow hereby further warrants that she is the President and CEO of UBS Inc., and that she is duly empowered to sign and submit this Consent Order on behalf of UBS Inc.

90.    Counterparts and Facsimile Execution:  This Consent Order may be executed in two or more counterparts, all of which shall be considered one and the same agreement and shall become effective when one or more counterparts have been signed by each of the parties hereto and delivered (by facsimile, e-mail, or otherwise) to the other party, it being understood that all parties need not sign the same counterpart.  Any counterpart or other signature to this Consent Order that is

delivered by any means shall be deemed for all purposes as constituting good and valid execution and delivery by such party of this Consent Order.

91. Contempt: Defendants understand that the terms of the Consent Order are enforceable through contempt proceedings, and that, in any such proceedings they may not challenge the validity of this Consent Order.

92. Agreements and Undertakings: Defendants shall comply with all of the undertakings and agreements set forth in this Consent Order.

There being no just reason for delay, the Clerk of the Court is hereby ordered to enter this *Consent Order for Permanent Injunction, Civil Monetary Penalty and Other Equitable Relief Against Defendants United Business Servicing, LLC, d/b/a SchoolofTrade.com, United Business Servicing, Inc,, d/b/a SchoolofTrade.com, Joseph Dufresne, a/k/a Joseph James, and Megan Renkow, a/k/a Megan James* forthwith and without further notice. Upon that entry, this matter shall be closed.

**IT IS SO ORDERED** this 22nd day of November, 2017

_____

**JOHN A. KRONSTADT**
**U.S. DISTRICT JUDGE**

CONSENTED TO AND APPROVED BY:

_____
United Business Servicing, LLC
By Megan Renkow

Dated: 7/24/17 _____

_____
United Business Servicing, Inc.
By Megan Renkow

Dated: 7/24/17 _____

_____
Joseph Dufresne

Dated: 7/24/17 _____

_____
Megan Renkow

Dated: 7/24/17 _____

Approved as to form:

_____
Gregory J. Morrow, Esq.
Squire Patton Boggs (US) LLP
555 South Flower Street, 31st Floor
Los Angeles, California 90071
213-689-5127
Attorney for Defendants United Business
Servicing LLC, United Business Servicing
Inc., Joseph Dufresne, and Megan Renkow

Dated: 7/24/17 _____

_____
Michael Solinsky
Alan I. Edelman
U.S. Commodity Futures Trading
Commission
1155 21st Street, N.W.
Washington, DC 20581
Telephone: (202) 418-5000
Attorneys for Plaintiff U.S. Commodity
Futures Trading Commission

Dated: _____11 / 13 / 17_____